UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DARITA STERLING-WARD,
Next Friend of Sharonda Sterling, a minor,

                Plaintiff,               No. 05-CV-70424-DT

vs.                                    Hon. Gerald E. Rosen

EDWARD TUJAKA, MICHAEL
ALMERANTI and LISA MONTICELLO,

                Defendants.
_____/


OPINION AND ORDER REGARDING
<u>MOTIONS FOR SUMMARY JUDGMENT</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____2/14/06_____

PRESENT:  Honorable Gerald E. Rosen
                      United States District Judge


I.  <u>INTRODUCTION</u>

Plaintiff Darita-Sterling Ward has brought this Section 1983 unlawful

arrest/excessive force action on behalf of her minor daughter, Sharonda Sterling, against

three Grosse Pointe Police Officers, Edward Tujaka, Michael Almeranti and Lisa

Monticello.  This matter is presently before the Court on Plaintiff's and Defendants'

cross-motions for summary judgment.  Responses and reply briefs have been filed.

Having reviewed and considered the parties' motions, briefs and supporting evidence,

1

and having heard the oral arguments of counsel at the hearing held on January 19, 2006, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

On May 21, 2004, at approximately 7:45 p.m., the Grosse Pointe police department received a complaint from a resident on St. Clair Street that a car had driven across his lawn.  Officer Michael Almeranti responded to the radio call and went to the complainant's home.  The complainant gave Officer Almeranti the license plate number and a description of the car:  a Honda which, according to a neighbor who witnessed the incident, was driven by "a black person with a white female in the passenger seat."[Almeranti Dep., p. 7.]  Almeranti called in the license plate number and learned that the address to which the car was registered -- 416 Neff, in the City of Grosse Pointe -- and that the registered owner was "Darita Sterling."[1]  Officer Almeranti then proceeded to Ms. Sterling's Neff Street residence.

While Almeranti was en route to the house, dispatch called the Sterling residence to see if anyone was there.  Dispatch told Almeranti that they had reached someone at the residence who was somewhat evasive but who had said that Darita Sterling was in the shower.

The person who answered the phone when the police called turned out to be 17-

---

[1]  Dispatch also advised Almeranti that there was an outstanding traffic warrant for the registered owner of the vehicle.  *Id.* at 14-15.

2

year-old Sharonda Sterling who, as it was later discovered, was the person who had

driven her mother's car up onto the lawn of the St. Clair property.  Sharonda, however,

did not have a driver's license; she had only a restricted learner's permit.  Hoping to

avoid getting into trouble, after the police called their house, Sharonda called her friend,

Ashley Read, and asked Ashley, who had her drivers' license, to cover for her and say

that she had been driving the car at the time. [*See* Read Dep., Plaintiff's Ex. 7, pp. 14-

16.][2]

Officer Almeranti arrived at the Sterling residence shortly after being advised by

dispatch that Ms. Sterling was home.  When he arrived and knocked on the door, he was

greeted by a teenager, later identified as Nicole Saleh. [Almeranti Dep., p. 16.][3] He

identified himself and informed the young woman that he was investigating an incident

of a car driving across a lawn on St. Clair and was there to find out what happened.  *Id.* at

17.  Nicole opened the door and told him to come in, and that he could speak to "the girl

that lives here." *Id.* at 18.[4]  Nicole then called Sharonda to come down to the living

---

[2]  When Sharonda called, Ashley was, in fact, driving the Sterlings' car en route to
pick up some friends to bring back to Sharonda's house.  (Sharonda called Ashley on her
cell phone.)  Sharonda's 15-year-old sister, Sylvallia, was in the car with Ashley at the
time.

[3]  Nicole Saleh testified that she and Renae Tomsha, who was also at Sharonda's
house at the time, were there because Sharonda had invited them to her house for a "get
together with some friends." [Saleh Dep., p. 7.]

[4]  Nicole Saleh also testified that she let Officer Almeranti in and told him that if
he needed to find Sharonda to come in. [Saleh Dep., Plaintiff's Ex. 5, pp. 11-12.]

3

room.  Sharonda Sterling testified that she was upstairs drying her hair when Officer

Almeranti arrived but that she heard the police arrive and that she told Nicole to tell them

that she was coming down. [Sharonda Dep., p. 17.]

Officer Almeranti and Sharonda both testified that once Sharonda was downstairs,

Almeranti asked her name and age and also asked Nicole Saleh and her other friend,

Renae Tomsha, who was also there their names and ages.  Almeranti then asked

Sharonda if her mother was home and when Sharonda said, "no," Almeranti told her that

the police dispatcher had related her response to dispatch's call that her mother was

taking a shower. [Almeranti Dep., pp. 18-19.] Sharonda then said that her mother was on

vacation, on her honeymoon.  *Id.* at 19; Sharonda Dep., p. 25.  When asked why she had

made up the story about her mother being in the shower Sharonda said that her mother

had told her not to give accurate information about her parents' whereabouts when they

were not home.  *Id*. at 18.

According to Officer Almeranti, at about this point in time, Lieutenant Edward

Tujaka and his partner, Officer Lisa Monticciolo, arrived on the scene.  Almeranti asked

Sharonda whether she knew anything about the Honda or the lawn incident.  Sharonda

replied that her friend, Ashley Read, had the car and that she knew nothing about where it

was or what was going on, that she only knew that Ashley was going to pick up some

friends.  Almeranti Dep., p. 19.  Almeranti asked Sharonda whether she had been driving

the car and she denied it, adding that said she only had her learner's permit.  *Id.*  The

officers then left the house and told Sharonda to let them know when the car comes back because they wanted to speak to Ashley Read.  *Id.* at 20-21.

After leaving the house, Lieutenant Tujaka stayed parked in his squad car across the street; Officers Almeranti and Monticciolo left in their squad cars and continued on routine patrol. [Monticciolo Dep., p. 7.]

As Officer Monticciolo proceeded down Neff and approached Jefferson, she observed a young female walking down the street dressed in what appeared to be "party attire" but walking barefooted.  *Id.*  Officer Monticciolo had a feeling that this young woman, later identified as Dana Henze, "was part of this situation" so Officer Monticciolo stopped to talk to her.  *Id.*  Dana told officer Monticciolo that she had been at the Sterling residence and was looking for her friends who were supposed to pick her up.  *Id.*

According to Officer Monticciolo, while she was talking to Dana Henze, Officer Almeranti radioed that he had located the Honda and that he was following the Honda back to the Sterling residence.  *Id.*  Officer Monticciolo asked Dana whether she would come with her back to the Sterling home and Dana agreed.  *Id.*  Dana got into the squad car and they drove back up Neff.  *Id.*

Officer Almeranti in his squad car and the Honda driven by Ashley Read and the three other occupants of the vehicle arrived at the Sterling residence at approximately the same time as Officer Monticciolo and Dana Henze.  Lieutenant Tujaka, who had

5

remained parked outside the residence, ordered a tow truck for the vehicle and proceeded to interview the five new arrivals. [Tujaka Dep., pp. 26-27.] Dana Henze told Lieutenant Tujaka that she had been in the Honda when Sharonda lost control of the vehicle and drove it up onto the lawn on St. Clair. *Id.* at 27.

Officer Monticciolo then proceeded to the door of the Sterling residence because she wanted to talk to Sharonda about what the police had just learned from Dana and the other interviewees. [Monticciolo Dep., p. 9.] She also wanted to see Sharonda's driver's permit or license. *Id.* at 11.  She knocked on the door and was invited inside by Nicole Saleh and Renae Tomsha. *Id.* at 10.  Once inside the house, Officer Monticciolo asked Nicole and Renae where Sharonda was and was told that she was upstairs in the bathroom. *Id.*  After waiting approximately 10 minutes, she asked the girls to upstairs and get Sharonda. *Id.* at 12.  The girls complied with the request and went upstairs. *Id.* However, they came back down shortly thereafter and told Officer Monticciolo that Sharonda was hiding somewhere in the house. *Id.*  Officer Monticciolo called to Officers Almeranti and Tujaka who had remained outside and told them what Nicole and Renae had said. *Id.*  Officer Almeranti came into the house, and he and Officer Monticciolo went upstairs looking for Sharonda. *Id.*

When they got to the second floor, as they approached the first door (which was locked) the could hear Sharonda talking on the phone. *Id.*  Officer Monticciolo knocked on the door and Sharonda screamed that she was on the phone with her "guardian." *Id.*

at 16. Officer Monticciolo told her that they needed to speak with her downstairs

regarding the situation on St. Clair. *Id.* Sharonda responded by screaming obscenities at

the officers, saying that her guardian had said that "us mother fuckers" were to get out of

her house. Almeranti Dep., p. 42; Monticciolo Dep. pp. 16-17. Officer Almeranti told

Sharonda to calm down, that they only needed to talk to her and that they needed to see

her driver's permit. *Id.* at 17; Almeranti Dep. at 42.

Sharonda finally opened the door, then she slammed it shut, and opened it again.

*Id.* at 18. She said she was not going to give the officers her permit until her guardian,

Linda (Warda), got there. *Id.* The officers once again advised her to come downstairs

and she finally acquiesced after she put on a nylon knee brace. *Id.* at 18-19.[5]

When they got downstairs, Sharonda became extremely agitated and again started

screaming and yelling and shouting obscenities. The officers kept telling her to calm

down and just produce her driver's license. Lieutenant Tujaka finally told her that if she

did not calm down with her behavior she would be placed under arrest for disorderly

conduct. *Id*. at 24, 32. Despite the pleas of her sister and friends begging her to calm

down, Sharonda did not calm down and continued her screaming and yelling. Almeranti

Dep. p. 51; Sylvallia Sterling Dep., p. 47.[6] Therefore, Officer Almeranti informed her

---

[5] Sharonda apparently had had knee surgery a short while before this date.

[6] By this time, a crowd of about 20 people had congregated outside the house. *See* Tujaka Dep., p. 35. Witnesses who were outside the house testified that they could hear Sharonda screaming and yelling inside the house. *See* Ashley Read Dep., p 27. Sharonda herself admits that she was making a lot of noise. Sharonda Dep. p. 47.

that she was being placed under arrest.  *Id.*.[7]  He told her to put her hands behind her back but she resisted.  Therefore, he and Officer Monticciolo grasped her under her arms and put her face down on the couch.  *Id.* at 33.  Each officer then took one of Sharonda's wrists and Almeranti handcuffed her behind her back.  *Id.*

The officers then told Sharonda to stand up and she again refused.  Therefore, they lifted her up and carried her out of the house.  Almeranti Dep. p. 54.  Sharonda, however, continued to struggle with the officers, and dug her heels into the ground, to resist going with them.  *Id.*  While resisting, Sharonda slipped and fell to the ground and allegedly reinjured her knee in the process.  *Id.*  In her deposition, Sharonda admitted that had she not have resisted and just stood up when the officers told her to do so, and if she had just walked calmly and cooperated she would not have fallen and would not have hurt her knee.  Sharonda Dep. pp. 40-46.

Once outside the house, Sharonda was placed in one of the police cars and was driven to the police station.  At the police station, Sharonda was fingerprinted and

---

[7]  All three of the officers testified that Sharonda was arrested for disorderly conduct in violation of Article V, § 46-121 of the Grosse Pointe City Code which provides:

> **Sec. 46-121.  Disorderly disturbance.**
> No person shall be drunk or intoxicated or make or assist in making any noise, disturbance or improper diversion, or any rout or riot, by which the peace and good order of the neighborhood are disturbed or be guilty of disorderly conduct.

*See* Defendant's Ex. I.  *See also*, Almeranti Dep., p. 52; Monticciolo Dep. p. 31; Tujaka Dep. pp. 31, 33-35.

photographed.  Plaintiff admits that she was at the police station only approximately 30 minutes.  She was given a ticket citing her with unlicensed driving, careless driving, malicious destruction of property, and disorderly disturbance.  *See* Plaintiff's Ex. 11.  Her "guardian," Linda Warda, posted $200 cash bond and Sharonda was released into her custody.

According to Plaintiff, immediately after being released, her "guardian" took her to the St. John Hospital emergency room for evaluation and treatment of the injuries she allegedly suffered to her right knee as a result of her arrest.[8]

Sharonda subsequently pled "responsible" to the careless driving charges and was fined $200.00; the City of Grosse Pointe agreed to dismiss the remaining charges.  *See* Plaintiff's Ex. 12.

On December 29, 2004, Plaintiff initiated the instant action in Wayne County Circuit Court.  Defendants timely removed the case to this Court on February 3, 2005.  In her Complaint, Plaintiff alleges two federal claims: unlawful arrest/seizure and excessive force in violation of the Fourth Amendment;[9] and state law claims of assault and battery,

---

[8]  Plaintiff further states that she later had to undergo two additional knee surgeries in June and December 2004 as a result of the May 21, 2004 injuries although no evidence of her emergency room treatment or these additional surgeries has been presented to the Court.

[9]  Although not separately denominated in her Complaint, the allegations therein and Plaintiff's Summary Judgment Brief make clear that Plaintiff is actually alleging three separate § 1983 claims.  In addition to the unlawful arrest and excessive force claims which are separately denominated in the Complaint as Counts V and VI, Plaintiff has alleged a Fourth Amendment "unlawful search or entry" claim.  *See* Plaintiff's

unlawful arrest/false imprisonment, and intentional infliction of emotional distress.  She

also alleges a claim of "supervisory liability" against Defendant Tujaka.  Discovery has

now closed and the parties' have filed cross-motions for summary judgment.[10]

Defendants claim that they are cloaked with qualified immunity with respect to Plaintiff's

Fourth Amendment claims.  They further claim Plaintiff's Section 1983 unlawful

arrest/seizure claim must fail because they had probable cause to arrest Plaintiff and that

they only used reasonable force in effectuating the arrest.  Defendants also claim that

Plaintiff's state law claims fail on the merits and by application of Michigan's

Governmental Immunity Statute.

## III.  DISCUSSION

## A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith

Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

_____

Complaint, ¶ 77(d) ("Defendants' presence in plaintiff's house was illegal and
unwarranted."); *see also* Plaintiff's Motion for Summary Judgment, pp. 7, 20-21.

[10]  Although Plaintiff filed her own Motion for Summary Judgment, this motion is
virtually verbatim what she filed as her "Response Opposing Defendant's Motion for
Summary Judgment."

and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.[11]  According to the *Celotex*

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential
> element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the
> movant's denial of a disputed fact, but must "present affirmative evidence in order
> to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that
> it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the

---

[11]"Taken together the three cases signal to the lower courts that summary
judgment can be relied upon more so than in the past to weed out frivolous lawsuits and
avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice &
Procedure</u>, § 2727, at 35 (1996 Supp.).

11

> respondent's evidence. The respondent must "do more than simply show that
> there is some metaphysical doubt as to the material facts." Further, "[w]here the
> record taken as a whole could not lead a rational trier of fact to find" for the
> respondent, the motion should be granted. The trial court has at least some
> discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also,*

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will

apply the foregoing standards in deciding the parties' motions for summary judgment in

this case.

**B.    QUALIFIED IMMUNITY PROTECTS DEFENDANTS FROM SUIT ON
        PLAINTIFF'S CLAIM OF UNLAWFUL ENTRY**

Although not framed as a separate "count," as part of her claim of excessive force,

Plaintiff alleged in her Complaint that "Defendants' presence in plaintiff's house was

illegal and unwarranted." Complaint, ¶ 77(d). Plaintiff now claims that by this assertion,

she meant to assert a separate § 1983/Fourth Amendment claim for "unlawful entry."

At the hearing on this matter, Plaintiff's counsel argued that the unlawful entry claim is

actually the threshold issue in this case because if the entry is unlawful then the arrest for

disorderly conduct cannot be found to be lawful nor can any degree of force be deemed

to have been reasonable. Plaintiff's proposed approach has some merit. *See, Strutz v.*

*Hall*, 308 F. Supp.2d 7667, 784 n. 9 (E.D. Mich. 2004). Therefore, the Court will

address Plaintiff's "unlawful entry" claim first.

**1.    THE OFFICERS' INITIAL ENTRY**

Plaintiff's "unlawful entry" claim is predicated upon the fact that the Defendants

12

did not have a search warrant entitling them to enter Ms. Sterling-Ward's home. However, a warrantless search may overcome the presumption of unreasonableness for Fourth Amendment purposes if an exception to the warrant requirement applies.

An exception to the warrant requirement exists where voluntary consent is given to search by the owner of the home or property or by someone with apparent authority to consent. *United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). If consent is given by an individual who has apparent authority, the Fourth Amendment's prohibition against a warrantless search does not apply. *Id.* When consent is given to a search of property owned by another, the consent is valid if the facts available to the officer at the moment would lead a reasonable person to believe that the consenting party had authority to do so. *See United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996); *see also, United States v. Hunyady*, 409 F.3d 297 (6th Cir. 2005) ("Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search." *Id.* at 303 (citations omitted)). Thus, if under the totality of the circumstances the officer performing the search has relied in good faith on a person's apparent authority, there is no Fourth Amendment violation. *Rodriguez, supra*, 497 U.S. 188-189.

Here, the undisputed evidence shows that the officers lawfully went to Plaintiff's

13

home to investigate the malicious destruction of property complaint.  When they arrived, the door was answered by Nicole Saleh.  Defendants told Ms. Saleh why they were there and Ms. Saleh let them in.  She did not hesitate in opening the door, nor did she tell them she had to check with Plaintiff or anyone else to see if she could let them in.  An objective officer with Defendants' information at the time they went to investigate the complaint could reasonably conclude that Nicole Saleh had authority to let Defendants into the house.

Indeed, although she had the opportunity to do so, Plaintiff never protested the officers' initial entry into the house.  She admits that she was upstairs drying her hair and that when she heard the officers' knocking she yelled down to Nicole Saleh to tell them she would be right there.  When she came downstairs, she did not tell the officers to leave or otherwise protest their entry into the house.  Rather, she answered their questions (albeit not truthfully) and the officers left after instructing her to let them know when her friend with the car returned.

Given these circumstances, when the officers returned a few minutes later (after locating the car driven by Ashley Read and after encountering Dana Henze and hearing from her a different story about the car and the St. Clair lawn incident from the story that Plaintiff had just given), they reasonably believed that Nicole Saleh was authorized to let them into the house the second time.   Under these circumstances, no constitutional violation for unlawful entry will lie.

14

2.   THE OFFICERS' CONTINUED PRESENCE ON THE <u>PREMISES</u>
<u>AFTER PLAINTIFF TOLD THEM TO LEAVE</u>

After Ms. Saleh let the officers in the second time, Plaintiff "hid" from them by locking herself in the upstairs bedroom, and when Defendants asked to talk to her, she yelled through the closed door that she wanted them to leave. To the extent that Plaintiff is asserting that the officers' continued presence in her home was unlawful after she told them to leave, Defendants are entitled to qualified immunity.

Qualified immunity shields public officials who perform discretionary functions from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *See Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005). The doctrine is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 452 U.S. 800, 818 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 353, 341 (1986). Qualified immunity is an affirmative defense; once asserted, the "burden of proof is on the plaintiff to show that the defendant[s] [are] not entitled to qualified immunity." *Armstrong v. City of Melvindale*, ___ F.3d ___, 2006 WL 27216 (6th Cir., Jan. 6, 2006) (citing *Sheets v. Mullins*, 287 F.3d 581, 586 (6th cir. 2002)).

Whether qualified immunity applies turns on the "objective legal reasonableness" of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* (citing *O'Brien*

15

*v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994)).  To analyze claims of

qualified immunity, the court uses a two-part test "(1) whether, considering the

allegations in a light most favorable to the party injured, a constitutional right has been

violated, and (2) whether that right was clearly established."  *Estate of Carter v. City of*

*Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201

(2001)).[12]  "The contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483

U.S. 635, 640, 107 S.Ct. 3034 (1987).  If the controlling law is not clearly established, an

official cannot be liable, because "a reasonable person would not be expected to know

how to structure his conduct to avoid liability."  *Mendoza v. Block*, 27 F.3d 1357, 1361

(9th Cir. 1994).

Assuming *arguendo* that Plaintiff's ordering the officers out of her house after

they were let in by Nicole Saleh negates the consensual entry such that their continued

presence in the house amounted to a violation of Sharonda's Fourth Amendment rights,

---

[12]  In some Sixth Circuit cases, the Court of Appeals occasionally has employed a three-step qualified immunity analysis, adding a third step to the inquiry "whether the plaintiff has offered sufficient evidence 'to indicate what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *See e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).  However, in cases subsequent to *Saucier*, the Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps, *see e.g., Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596 (2004); *Groh v. Ramirez*, 540 U.S. 551, 563, 124 S.Ct. 1284 (2004), and since the two-step approach comports with the Supreme Court's most recent qualified immunity cases, it is this approach that the Court will apply here.

16

Plaintiff's rights under the Fourth Amendment in this context cannot be said to have been clearly established at the time of this incident (nor since). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful **in the situation he confronted**." *Saucier, supra*, 533 U.S. at 202 (emphasis added). *See also, Armstrong v. City of Melvindale, supra*, ("In undertaking this inquiry, we do not assess the right violated at a high level of generality, but instead, we must determine whether the right [is] 'clearly established' in a more particularized sense. . . .")

With regard to consensual entry by a third-party that was subsequently revoked by the homeowner/occupant, *Koch v. Town of Brattleboro*, 287 F.3d 162 (2nd Cir. 2002), is factually very similar to the instant action.

In *Koch*, the defendant-officers went to Plaintiff Fred Koch's home to arrest him for unlawful restraint arising out of a complaint that he had run the complainants' car off the road so as to impede their ability to exit the car and then threatened them physically and orally. *Id.* at 164. The officers did not request nor obtain a search or arrest warrant before going to Koch's house. *Id.*

Upon their arrival at Koch's residence, Doris Reed, a friend of Koch's, answered the door. The officers knew that Ms. Reed was Koch's friend and that she lived at a separate residence. *Id.* at 164-65. Ms. Reed invited the officers in and told them that the plaintiff was upstairs. *Id.* at 164. After the officers entered the house, Koch appeared at

17

the top of the stairs and told the officers to leave.  *Id.* at 165.  The officers did not leave;

instead, they told Koch that they wanted to talk to him, and followed Ms.  Reed upstairs

toward Koch.  *Id.*  Koch remained angry and orally abusive at the officers' continued

presence, and then went into one of the upstairs rooms and shut the door.  *Id.*  The

officers knocked on the door to the room.  *Id.*  Koch opened the door briefly, let Ms.

Reed in, then shut the door and locked it.  *Id.*  When Koch would not respond to the

officers' continued knocking, one of the officers picked the lock, entered the room,

handcuffed Koch and took him transported him to the police station.  *Id.*  Koch was

released from custody within an hour or two and was arraigned the next day on charges

of disorderly conduct.  *Id.*

Koch subsequently sued the defendant-officers under § 1983 alleging that the

above-actions violated his Fourth Amendment rights.  The district court granted the

defendants' motion for summary judgment on qualified immunity grounds.

On appeal, the Second Circuit held that the officers' belief that Reed had the

authority to consent to their entry was reasonable.  287 F.3d at 167.  The question was

whether their continued presence over the plaintiff's objection violated Koch's Fourth

Amendment rights.  *Id.*  at 168.  The Second Circuit concluded that the law does not

provide a clear answer to this question, thus the right is not "clearly established" and the

defendants were, as a result, entitled to qualified immunity.

Writing for a unanimous court, Sixth Circuit Judge Damon Keith, sitting by

18

designation on the Second Circuit, explained:

> Although Koch's Fourth Amendment rights were not violated by the police officers' initial entry into the house, Koch also argues that their continued presence over his objections violated his Fourth Amendment rights. It is unsettled whether the Fourth Amendment allows the police to remain in a home over the objections of the primary occupant when they enter pursuant to the reasonable belief that a third party, whom the police know had lesser authority over the premises than the primary occupant, has consented to their entry. Therefore, Koch cannot point to a "clearly established right" that was violated.

287 F.3d at 168.

Judge Keith then proceeded to discuss earlier third-party consent cases to

demonstrate how the law in this context is unsettled:

> Some lower courts have addressed whether the Fourth Amendment requires the police to leave a residence when the primary occupant objects to a third party's consent to their search. All begin with the Supreme Court's decision in [*United States v.*] *Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 [(1974)].

> In *Matlock*, the defendant was arrested based on evidence that the police found at his residence without a warrant or the defendant's consent. When the police first approached the residence, they saw the defendant outside in the front yard. Instead of asking the defendant himself for consent to search his residence, the police obtained the consent of a third party. In upholding the search of the residence and seizure of evidence found inside, the Supreme Court stated that "permission to search [may be] obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171, 94 S.Ct. 988. The *Matlock* Court reasoned that in such a situation, "it is reasonable to recognize that. . . others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at n. 7, 94 S.Ct. 988.

> The fact that the defendant in *Matlock* was present, but not consulted, at the time of the search has played an important role in

19

subsequent lower court decisions where the defendant has specifically objected to a third party's consent.  The leading Court of Appeals case on point, *United States v. Sumlin*, 567 F.2d 684 (6th cir. 1977), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), held that the facts of *Matlock* showed that a defendant's objection to a search is irrelevant if an authorized third party consents to the search.  Citing the fact that the defendant in *Matlock* was present, although not consulted for his consent, the court said:

> There is no reasonable expectation of privacy to be protected under such circumstances.  We cannot see how the additional fact of Appellant's initial refusal to consent in any way lessened the risk assumed that his co-occupant would consent.  This additional fact does not increase a reasonable expectation of privacy.

*Id.* at 688.  It is worth noting however, that although the *Sumlin* court considered the Appellant to have objected to the search, the court also found that after his initial objection, the defendant did not urge the third party to withhold consent and even told her that her consent need not be withheld.  *Id.* at 685.  Additionally, the third party in *Sumlin* was a co-occupant of the residence, having her name on the lease.  Therefore, the third-party's authority probably inhered independent of the defendant.  Here, as discussed earlier, Reed's authority was probably not independent of Koch's, but derived from Koch's "permission to gain access."

Koch advances the counter-argument that because a primary occupant has the greater power to create and destroy a third party's authority to consent to a search of his personal and exclusive premises, the primary occupant retains the lesser power to object to a third party's consent when present.  Such an objection would thus revoke or limit the third party's existing authority to consent; when he is absent or silent, however, he would assume the risk that the third party may act adversely to his interests.

While not deciding which of these or other positions is mandated by the Fourth Amendment, we note that existing law is unclear on this issue.  Therefore, Koch cannot point to a "clearly established right" that [Officers] Lake and Holbrook violated in order to break the officers' qualified immunity and survive the summary judgment motion.

20

*Id.* at 168-69.

Here, as in *Koch*, the defendant-officers entered Plaintiff's home based on the valid consent of a third-party, Nicole Saleh.  They had no reason to believe that Saleh was not authorized to let them in this second time in light of the fact that Saleh had let them in earlier that day and Plaintiff never voiced any objection to their presence at that time.  Once the officers were in the home, they went upstairs to talk with the Plaintiff, who was in a room with the door closed.  Plaintiff then exited the room and told them to leave.  As the *Koch* court explained, the law governing the question of whether at this point the officers' continued presence over Plaintiff's objections violated the occupant of the home's constitutional rights is not clearly established.  As such, no reasonable officer presented with this situation would have known that his conduct violated the Fourth Amendment.  Consequently, the Defendants are entitled to qualified immunity on Plaintiff's "unlawful entry" claim.


C.    <u>DEFENDANTS HAD PROBABLE CAUSE TO ARREST PLAINTIFF</u>

Plaintiff further claims that Defendants deprived her of her Fourth Amendment right to be free from an unlawful arrest/seizure.[13]  The Fourth Amendment requires that probable cause support an arrest.  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001), *cert.*

---

[13]  The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 326, 121 S.Ct. 1536 (2001).

21

*denied*, 537 U.S. 819 (2002).  Thus, "for a wrongful arrest claim to succeed under §

1983, a plaintiff must prove that the police lacked probable cause."  *Fridley v. Horrighs*,

291 F.3d 867, 872 (6th Cir. 2002) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th

Cir. 1999).  "Probable cause exists where there is a fair probability that the individual to

be arrested has either committed or intends to commit a crime."  *Id.*, 291 F.3d at 872.

"Probable cause is assessed from the perspective of a reasonable officer on the scene

rather than the 20/20 hindsight, and thus, probable cause determinations involve an

examination of all facts and circumstances within an officer's knowledge at the time of

the arrest."  *Klein, supra*, 275 F.3d at 550 (citing *Kostrzewa v. City of Troy*, 247 F.3d

633, 639 (6th cir. 2001).

Plaintiff in this case was arrested for disorderly conduct, a civil misdemeanor

under the City of Grosse Pointe's city ordinances.  Article V, § 46-121 of Grosse Pointe's

City Code provides:

> **46-121.  Disorderly disturbance.**
> No person shall be drunk or intoxicated or make or assist in making any
> noise, disturbance or improper diversion, or any rout or riot, by which the
> peace and good order of the neighborhood are disturbed or be guilty of
> disorderly conduct.

Defendants' Ex. I.

The ordinance requires only that the person engage in prohibited conduct that

disturbs the peace of the neighborhood.  As discussed above, it was Plaintiff's yelling and

screaming of obscenities at Officer Almeranti and Officer Moticciolo that gave rise to her

22

arrest.  Lieutenant Tujaka, who was outside talking with Plaintiff's sister at this point, heard Plaintiff "yelling and screaming and swearing" inside the house. [Tujaka Dep. at 28-29; *see also* Monticciolo Dep. at 24.]  Neighbors began to congregate in front of Plaintiff's house. [Almeranti Dep. at 48; Tujaka Dep. at 35.] One of Plaintiff's friends, Ashley Read, was standing at the curb outside the house and she testified that she heard Plaintiff screaming inside the house. [Read Dep., p 27.] Nicole Saleh who was inside the house testified that the officers tried to calm Plaintiff down but she continued to scream and yell. [Saleh Dep. at 24.] Plaintiff continued carrying on and Officer Almeranti placed her under arrest for disorderly conduct under the City Ordinance, § 46-121. [Tujaka Dep. at 33-34; Almeranti Dep at 51; Monticciolo Dep. at 31.]

"If an officer had probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001).  The foregoing evidence of Plaintiff's conduct -- which was committed in Defendants' presence -- establishes that the officers had probable cause to arrest Plaintiff and, pursuant to *Atwater*, no constitutional violation upon for unlawful arrest/seizure occurred.[14]

---

[14]  The fact that Defendants were investigating an offense that was not "closely related" to the offense for which Plaintiff was ultimately arrested does not affect the constitutionality of Plaintiff's arrest where probable cause existed to arrest for either offense.  *See Devenpeck v. Alford*, 543 U.S. 146, 125 S.Ct. 588 (2004).  The evidence of record shows that not only did Defendants have probable cause to arrest Plaintiff for disorderly conduct but also they had probable cause to arrest her for malicious

D.     PLAINTIFF HAS FAILED TO ESTABLISH THE USE OF EXCESSIVE
       FORCE

       Plaintiff also contends that the officers are liable to her for damages pursuant to §

1983 because she claims the officers used excessive force in arresting her the evening of

May 21, 2004.  Defendants respond by asserting that a reasonably competent police

officer could have concluded that their actions on the evening in question were

reasonable.

       In *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1989), the Supreme Court

established a number of guidelines to be followed by lower courts in evaluating claims

alleging excessive force in the course of an arrest. First, because these questions involve

seizures, the Fourth Amendment "reasonableness" test is the appropriate standard by

which such claims are to be judged. 109 S.Ct. at 1871. The Court continued:

> Determining whether the force used to effect a particular seizure is "unreasonable"
> under the Fourth Amendment requires a careful balancing of "'the nature and
> quality of the intrusion on the individual's Fourth Amendment interests'" against
> the counterveiling governmental interests at stake. ... Our Fourth Amendment
> jurisprudence has long recognized that the right to make an arrest or investigatory
> stop necessarily carries with it the right to use some degree of physical coercion or
> threat thereof to effect it.

109 S. Ct. at 1871-72. The Court added:

> The "reasonableness" of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20 vision
> of hindsight. . . . The calculus of reasonableness must embody allowance for the

---

destruction of property.  Ashley Read and Dana Henze each separately told the officers
that Plaintiff had driven the Honda onto the resident's lawn on St. Clair then left the
scene.

> fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

109 S.Ct. at 1872.  *See also Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993); *Leber v. Smith*, 773 F. 2d 101, 105 (6th Cir. 1985) ("The issue we must address, then, is whether [the police officer's] actions were reasonable under the Fourth Amendment. . . . [c]onsidering [all] factual circumstances surrounding the incident in question . . . .") *cert. denied*, 475 U.S. 1084, 106 S. Ct. 1466 (1986); *Damron v. Pfanens*, 785 F. Supp. 644, 647 (E.D. Mich. 1992).

In *Graham*, the Supreme Court suggested a number of factors that a court may consider in evaluating excessive force claims, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  This list, however, is not exhaustive, as the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure."  *Id.* The Court, however, made clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment."  *Id.* As the Sixth Circuit observed in *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), the Fourth Amendment's reasonableness standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."  *Id.* at 944.

Finally, as the *Graham* court explained, the state of mind of the officers at the time of arrest has no bearing on the reasonableness of their actions at the time of the arrest and, as such, it is reversible error for a lower court to inquire into the officers' subjective state of mind in deciding the reasonableness issue:

> We do not agree with the Court of Appeals' suggestion that the "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances.  Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment. * * * The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry.

109 S. Ct. at 1872 (citations omitted).  *See also, Branham v. City of Dearborn Heights*, 830 F. Supp. 399, 401 (E.D. Mich. 1993).

Applying the foregoing principles to the evidence of record in this case, there is no genuine issue of material fact whether Defendants used objectively reasonable force under the circumstances to effectuate Plaintiff's arrest for disorderly conduct.  The evidence of record is undisputed -- indeed Plaintiff herself admits as much -- that even though Plaintiff was being investigated and ultimately arrested for a minor offense, she continuously resisted her arrest, which required the officers to use force to subdue her. [*See* Sharonda Sterling's Dep. pp. 40, 42-46; Almeranti Dep., at 53-54; Monticciolo Dep. at 34; Tujaka Dep. at 37; Nicole Saleh Dep. at 29.]  When Officers Almeranti and Monticciolo attempted to arrest her, Plaintiff was "yelling and screaming," kept kicking

26

her legs and flailing her arms, would not let herself be taken off the couch, and dug her feet into the floor to prevent from being moved forward. [Sharonda Dep. at 40, 42, 44.]

Under the circumstances, it was reasonable for the officers to use force to restrain Plaintiff, get her handcuffed, and into the squad car. Indeed, Plaintiff herself admits that had she not resisted she would have been able to stand up, walk freely and without incident to the police car, and would not have hurt her knee, which is the only injury she complains she suffered as a result of her arrest. *Id.* at 43. Under these circumstances, no claim of unconstitutional use of excessive force will lie.

For all of the foregoing reasons, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion for summary judgment on Plaintiff's Section 1983 claims in Counts 5 and 6 of the Complaint.

E.      SUMMARY JUDGMENT WILL ALSO BE GRANTED IN FAVOR OF DEFENDANTS ON PLAINTIFF'S STATE LAW CLAIMS

Plaintiff has also asserted state law claims of assault and battery, false arrest/false imprisonment, and intentional infliction of emotional distress.

1.      ASSAULT AND BATTERY

To recover for an assault, a plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVourous v. Burmeister*, 262 Mich. App. 467, 482-483, 687 N.W.2d 132 (2004). To

27

recover for battery, a plaintiff must show a "wilful and harmful or offensive touching of another which results from an act intended to cause such contact." *Id.*

However, where defendants used reasonable force to effect the lawful arrest of the plaintiff, the plaintiff's assault and battery claims cannot withstand summary judgment. *See, Kahlich v. City of Grosse Pointe Farms*, 120 Fed. Appx. 580, 586 (6th Cir. 2005) (citing *Brewer v. Perrin*, 132 Mich. App. 520, 349 N.W.2d 198, 202 (1984).

As set forth above in the discussion of Plaintiff's Section 1983 claims, Defendants in this case used reasonable force under the circumstances to effectuate Plaintiff's arrest. Therefore, the Court will dismiss Plaintiff's assault and battery claim.

2.   FALSE ARREST/FALSE IMPRISONMENT

False imprisonment is the "unlawful restraint on a person's liberty or freedom of movement." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 17, 672 N.W.2d 352 (2003). False arrest is an "illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant." *Id.* To prevail on a false arrest and/or false imprisonment claim, the plaintiff must show that the arrest was illegal, meaning it was not based on probable cause. *Peterson, supra*, 259 Mich. App. at 18. Thus, if the defendants had probable cause to arrest the plaintiff, her false arrest/false imprisonment claim must be dismissed. *See Kahlich, supra*, 120 Fed. Appx. at 586; *Lewis v. Farmer Jack, Inc.*, 415 Mich. 212, 327 N.W.2d 893, 894 (1982).

As set forth above, the defendant-officers in this case had probable cause to arrest

28

Plaintiff for disorderly conduct under the Grosse Pointe "Disorderly Disturbance" ordinance. The fact that this charge was ultimately dismissed is irrelevant. *See Peterson, supra*. Because there was probable cause to arrest Plaintiff, her false arrest/false imprisonment claim fails as a matter of law.

3.    <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

The Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence. *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n. 7, 614 N.W.2d 590, 593 n. 7 (2000); *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 907 (1985); *Khalifa v. Henry Ford Hospital*, 156 Mich. App. 485, 499, 401 N.W.2d 884, 890 (1987); *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir.1998). However, the Michigan Court has described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the defendant's conduct had been extreme and outrageous. It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be

29

> hardened to a certain amount of rough language, and to occasional acts that
> are definitely inconsiderate and unkind.  There is no occasion for the law to
> intervene in every case where someone's feelings are hurt.  There must still
> be freedom to express an unflattering opinion, and some safety valve must
> be left through which irascible tempers may blow off relatively harmless
> steam.

*Roberts v. Auto Owners, supra*, 422 Mich. at 602-603, *quoting* Restatement 2d of Torts, §

46, comment d.

Applying these standards in this case, the evidence does not show that Defendants'

conduct was "so outrageous in character, and so extreme in degree, as to go beyond all

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community" so as to allow Plaintiff to recover under this theory.

4.   <u>SUPERVISORY LIABILITY OF DEFENDANT TUJAKA</u>

Finally, Plaintiff alleges in her Complaint that Defendant Tujaka, as the

supervising officer on duty, "directed, encouraged, participated in, was responsible for,

authorized and/or approved" the complained of actions of the other defendant officers.

*See* Complaint, ¶ 63.  As set forth above, however, the Court has found no merit in any of

Plaintiff's substantive claims.  Therefore, Plaintiff's *respondeat superior* theory of

liability against Defendant Tujaka also fails as a matter of law.

<u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is

GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be DISMISSED in its

entirety, with prejudice.

Let Judgment be entered accordingly.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  February 14, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on February 14, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager